**Raymond A. CASPER, Roy Land, Lyle Sprague**

v.

**The WASHINGTON POST CO.**

**Civ. A. No. 79-3997.**

United States District Court,
E.D. Pennsylvania.

Oct. 19, 1982.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

At the close of plaintiffs' evidence in this nonjury case, the defendant has made an oral motion for a "directed verdict". Presumably, this was intended as a motion for involuntary dismissal pursuant to F.R.C.P. 41(b), and it will be so treated. That rule provides:

> "After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). . . ."

Plaintiffs, three Philadelphia police officers, claim to have been libeled by an article published in the Washington Post in August 1979, concerning a celebrated "police brutality" case which had occurred some two years earlier, in April 1977, and in which the plaintiffs were involved.

The evidence is to the effect that a motorist named Cradle, a young black man, failed to obey a stop sign, and his vehicle was stopped by Philadelphia police. After producing his driver's license and registration, Mr. Cradle became either alarmed or impatient because of the length of time he was being detained at the scene; he re-entered his vehicle and drove off. He was again apprehended a couple of blocks away, while stopped at a traffic light. At that location, an extensive physical scuffle occurred. According to the police, Cradle refused to get out of his car, and tried to lock himself in. Plaintiff Casper then smashed the window of Cradle's car and, along with other officers, turned off the ignition. Cradle was either forcibly removed from the car, or emerged voluntarily.

According to Cradle, he was thereupon severely beaten and kicked. According to the officers, he crawled under his car, attempted to re-enter it, and had to be forcibly subdued.

The scuffle was witnessed by numerous passers-by and residents of the neighborhood, none of whom were personally· acquainted with any of the participants, and all of whom verified Cradle's account of the incident. Many of these persons lodged complaints with police officials about the treatment of Mr. Cradle.

Cradle was charged with resisting arrest and assault and battery, but these charges were never prosecuted. Instead, criminal prosecutions were instituted against these plaintiffs by both state and federal authorities. Only the federal charges were brought to trial. After a lengthy trial in November 1977, the defendants were all acquitted of the charge that they willfully violated Cradle's constitutional rights.

Jonathan Neumann was, at the time of the original incident and the criminal trial of the plaintiffs, a reporter employed by the Philadelphia Inquirer. Together with a partner, William K. Marimow, Neumann had authored numerous articles in the Philadelphia Inquirer concerning police brutality, including a four-part series (on civilian deaths at the hands of police) which was awarded a Pulitzer Prize.

The Cradle incident, and the ensuing trial of these defendants, generated extensive press coverage. Messrs. Neumann and Marimow covered the trial for the Inquirer. It is undisputed that their accounts of the trial and its aftermath were true and accurate in all respects.

Some two years later, in August 1979, at which time Mr. Neumann was working for the Washington Post, the United States Justice Department, with much public fanfare, brought suit in federal court in this district against the City of Philadelphia, its mayor and police officials, charging widespread and systematic violations of civil rights, and seeking injunctive and declaratory relief against what, for convenience, may be referred to as "police brutality". Naturally enough, this event generated a new spate of publicity about the Philadelphia Police Department.

The article which is the subject of the present litigation appeared in the Washington Post in conjunction with, and as background for, its principal, and lengthier, story concerning the Justice Department litigation. Bearing the heading "Philadelphia Police, the Toughest In the World," the article included the following:

"On a cool, damp spring night two years ago, more than 20 Philadelphians watched in stunned disbelief as 10 policemen beat a black man, breaking night sticks on his head and shoulders, after he had run a stop sign. A few days later, in early May 1977, Philadelphia Mayor Frank L. Rizzo said this about the incident: 'It's very easy to break some of these night sticks nowadays.' "

And:

"Philadelphia's policemen face the same frustrations all big-city cops face, but they, unlike most other police, feel freer to say what is on their minds and to vent their frustrations on suspects and witnesses."

It is to be noted that the plaintiffs are not named in the article. On the other hand, there can be no doubt that persons

familiar with the Cradle incident (and, in view of the exceptionally large amount of publicity that incident had generated, this undoubtedly includes a large number of people) understood that the article was referring to the Cradle case, and therefore to these plaintiffs as among the night-stick wielders.

Plaintiffs contend that the article is false and misleading in that, in effect, it charges plaintiffs with mistreating Mr. Cradle, yet fails to mention the fact that they were acquitted of all charges in connection with the case.

The defendant's principal contention on that score is that the article was not intended to, and does not, deal with the actions of specific police officers. The principal thrust of the article was to convey the atmosphere which formed the background of the Justice Department litigation. The only relevance of the Cradle incident was Mayor Rizzo's alleged reaction to the initial charges.

It is, I believe, perfectly understandable that the plaintiffs, having endured the ordeal of a highly publicized criminal trial at which they were exonerated by the jury, would take umbrage when, two years later, the entire episode again found its way into print. But the plaintiffs' own evidence establishes that no statement in the Post article is actually false. The civilian witnesses were unquestionably shocked and horrified; there were at least nine police officers involved in the incident; there was a violent struggle; and at least one night stick was used. Plaintiffs do strongly dispute the assertion that excessive force was used, that more than one night stick was employed, and that all ten officers beat Mr. Cradle. But it is agreed that these three plaintiffs all used physical force against Cradle. Indeed, in a pretrial deposition in this case, the plaintiff Casper admitted that he struck Cradle with his night stick, after Cradle emerged from the vehicle. (The testimony of all of the officers at the criminal trial, and of the other plaintiffs at this trial, was that Casper had only used his night stick to break the window of Cradle's car.)

The only real question is whether the article is rendered defamatory by the omission of the fact that the officers were later acquitted of criminal charges. In my view, the article is not thereby rendered actionable. The criminal case is not mentioned at all. Inclusion of the information that three of the officers were indicted for violating Cradle's constitutional rights, but acquitted, was irrelevant to that particular story, and would not have placed the officers in any better light in the public mind. Police officers can use excessive force in subduing a suspect without being guilty of the federal offense charged. When one considers that the entire incident was precipitated by an alleged traffic violation for which the police had no right to make an arrest at all, it is difficult to view this article as defamatory in any respect.

Moreover, it is very clear from the plaintiffs' evidence that their real complaint is with the renewed publicity stemming from the Justice Department lawsuit, and not from the Post article itself. The only persons shown to have read the Post article, and to have understood it as applying to these plaintiffs and the Cradle incident, are relatives, friends, or colleagues of the plaintiffs, all of whom share plaintiffs' view that the plaintiffs' actions were proper in all respects.

But the principal reason for dismissing this action is that the evidence totally fails to meet plaintiffs' burden of proving actual malice. There can be no doubt that Mr. Neumann and his partner thoroughly investigated the Cradle incident, and thoroughly and accurately covered the events of the trial. Plaintiffs themselves concede that Neumann sincerely believed, and still believes, that Cradle was mistreated, as Cradle and the civilian witnesses all testified. From plaintiffs' own evidence, it is simply impossible to conclude that the article was written either with actual knowledge of its falsity, or with reckless disregard of the truth. A newspaper and its reporters do not lose their First Amendment protections merely because plaintiffs sincerely believe that they are biased.

The defendant's motion for involuntary dismissal will therefore be granted.